OPINION
{¶ 1} Plaintiff-appellant Areawide Home Buyers, Inc. (the Buyer) appeals the decision of the Mahoning County Common Pleas Court which upheld a magistrate's decision finding mutual rescission of a purchase agreement and land contract. The magistrate granted judgment for defendants-appellees Michael and Ann Manser (the Sellers) on the Buyer's claim for lost profits and awarded the Sellers $871.43 as the difference between payments already received by the Buyer and the value of the Buyer's use of the Sellers' realty over the term of the now-rescinded land contract.
 {¶ 2} The Buyer's main contention is that rescission was not a proper remedy under the facts of this case because there was no mutual breach of contract as the Sellers prevented the Buyer from completing the contract. If rescission was proper, the Buyer alternatively claims that it should have been reimbursed for a $2,000 payment made for extension of an option and that the magistrate improperly calculated and granted the Sellers fair rental value for the property. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 3} On July 22, 1996, the parties entered into a purchase agreement for the sale of the Sellers' realty in Goshen Township, Ohio and a land contract for occupancy of the premises pending the sale. The purchase price was $112,000, and $3,000 was paid in down payments. The Buyer paid monthly payments of $977 to the Sellers starting September 1, 1996, the date of occupancy. Closing was to occur on September 1, 1997, but it did not proceed on that date. Rather, the Buyer continued to pay the monthly payments, and on March 19, 1998, an addendum was signed by the parties extending the term of the land contract and accompanying closing date until May 1, 1998. The Buyer paid the Sellers $2,000 in conjunction with this extension.
 {¶ 4} When the time for closing drew near, the Sellers informed the Buyer's escrow and title agent that they would not accept the $103,131.39 amount the Buyer believed was owed. The title agent first testified that the Sellers did not provide her with the figure that they believed was appropriate for the Buyer's payoff. (Tr. 17). The escrow agent later stated that she could not remember if the Sellers informed her of the amount they desired, but she probably would have noted it in her files if they had. (Tr. 39, 42). She noted that she did not take notes on every phone call, that there would have been more calls than the two she had noted, and that the Sellers could have talked to someone else at the office. (Tr. 29-32). The Sellers claim that when someone from the title company called and instructed them to bring money to closing to pay off their small second mortgage, Mrs. Manser advised them that the balance due from the Buyer was $109,000. (Tr. 65, 86).
 {¶ 5} The date for closing passed without payment. The dispute centered over whether the $977 monthly payments were to be applied to the balance of the purchase price owed as the Buyer claimed or whether they were as the Sellers claimed, mere mortgage assumption payments for occupancy since they were the exact amount of the Sellers' mortgage payments, including tax and insurance. There was also a dispute as to whether the $2,000 payment for extension of the closing date should be credited to the Buyer against the balance due.
 {¶ 6} On May 18, 1998, the Sellers sent a letter to the Buyer alleging breach of contract. The letter opined that the Buyer came to the closing with an incorrect amount, but did not state what the Sellers believed the correct amount to be. The Sellers claimed at trial that they had several contacts with an employee of the Buyer prior to writing this letter, but the Buyer would not agree to the amount they demanded. (Tr. 76, 89, 100). The letter mentioned "numerous attempts with your office to resolve this matter * * *."
 {¶ 7} The sole shareholder of the Buyer, a now inactive corporation, testified that she was never informed of the payoff amount desired by the Sellers (until a year later where an attorney stated that the payoff was $110,000). (Tr. 108, 111, 115-116). She alleged that if the Sellers had informed her of their demand for $109,000 at closing, she likely would have negotiated her offer up to approximately the amount the arbitrator ended up calculating. (Tr. 112).
 {¶ 8} The Buyer filed the within lawsuit on June 16, 1998. In the complaint, the Buyer alleged that the purchase price balance was $102,311.16 (as another payment had been made since their attempted closing), that they timely tendered the full purchase price, and that the Sellers refused to deliver an executed deed. The Buyer asked the court to declare the balance due and grant specific performance or award $50,000 in compensatory damages for lost profits. As background for the damage claim, it is notable that the Buyer had entered into a purchase agreement with the Kirkpatricks to purchase the subject realty for $121,000 under land contract with monthly payments of $1,114.83 for principal, interest at 9.9% per year compounded monthly, and taxes.
 {¶ 9} The Sellers answered, denying that the Buyer timely tendered full payment. Among other things, they alleged express and implied waiver and consent as affirmative defenses. Additionally, the Sellers counterclaimed for quiet title and any further equitable relief the court deems just. The Sellers reiterated their claim that the Buyer failed to purchase the property by the closing date. They also alleged that the Buyer's recent actions, such as filing an affidavit on the real estate, have caused a cloud on the Sellers' title. The Sellers later amended their counterclaim seeking damages due to the cloud on their title.
 {¶ 10} The case was ordered into arbitration. On February 22, 2000, an arbitrator filed a report stating that the proper payoff figure was $106,454.66. In reaching this figure, the arbitrator found that $846.06 of each $977 monthly payment was to be credited against the principal and interest of the $109,000 balance (with the remainder of the monthly payment going toward taxes and insurance). The arbitrator assumed a thirty-year amortization schedule since the Sellers mortgage was on this schedule and the payments were intended to cover such mortgage. The arbitrator also stated that the ambiguous and confusing language in the $2,000 extension addendum should be construed against the Buyer as the drafter so that this payment only constituted consideration for an extension of the closing date and not credit against the principal due for the purchase of the property.
 {¶ 11} The parties did not contest these findings. Rather, they accepted them and proceeded to a trial before the magistrate in November 2003, on the remaining issues of breach and damages or other remedies. On March 18, 2004, the magistrate filed a decision finding that the contract was rescinded due to mutual failure of the parties to perform and/or mutual mistake as to the essential element of price or terms of payment. The magistrate held that both parties breached the agreement as to payoff since the Arbitrator found the payoff to be $106,454.66, the Buyer offered only $103,131.39, and the Sellers would accept no less than $109,000.
 {¶ 12} The magistrate thus concluded that the parties should be restored to their respective positions prior to entering the contract. Still, the magistrate did not credit the Buyer with the $2,000 paid in March 1998 for an extension of the closing date. The magistrate opined that this payment and extension of the closing date was a contract completed, which allowed the Buyer to avoid forfeiture at that time.
 {¶ 13} The magistrate then stated that the Sellers were entitled to compensation for the Buyer's use of the Sellers' land. The magistrate found this value to be $1,114.83 per month, which was the amount the Buyer was collecting from the Kirkpatricks. The magistrate thus calculated that the Buyer should pay the Sellers $23,411.43 for twenty-one months of occupancy. However, the magistrate credited the Buyer with $22,540, representing the $3,000 paid in down payments and $977 per month paid for twenty months. Thus, the magistrate ordered the Buyer to pay the Sellers $871.43, which represents the difference between the amount paid and the computed value of the use of the property. The magistrate concluded by ordering quiet title to the Sellers.
 {¶ 14} The Buyer filed timely objections along with the trial transcript. The Buyer assigned three objections; making the same arguments they now make on appeal. On June 17, 2004, the trial court overruled the objections. The Buyer filed timely notice of appeal. This court held the appeal in abeyance pending a final judgment in the case due to the trial court's mere adoption of the magistrate's decision without entering its own judgment. The trial court filed such final judgment on September 28, 2004.
 ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO {¶ 15} The Buyer addresses the first two assignments of error together; these assignments allege:
 {¶ 16} "The trial court erred to the prejudice of appellant by affirming the magistrate's decision, which was improperly made against the weight of the evidence presented."
 {¶ 17} "The trial court erred to the prejudice of appellant by affirming the magistrate's decision to grant the inappropriate remedy of rescission as there was no mutual breach of the parties' contract."
 {¶ 18} The Buyer takes issue with the magistrate's statement that mutual failure to perform is the equivalent of rescission. The Buyer argues that the mutual failure to perform only gives rise to a presumption of mutual assent to rescission, which may be rebutted. The Buyer then argues that the evidence did not indicate an intent on their part to rescind the contract. They note that they never missed a payment under the land contract, they paid over $20,000 so far, they actively and timely tried to close by putting more than enough funds in escrow and providing documentation on their claimed payoff figure to the escrow agent, and they filed suit immediately after receiving the letter accusing them of breaching the contract.
 {¶ 19} The Buyer also claims that there was no mutual mistake warranting rescission because only a buyer is entitled to rescission and they did not ask for this remedy. The Buyer argues that the elements of mutual mistake as to a material part of the contract are not shown because only the language of the addendum was found to be confusing, not the terms of payment in the land contract.
 {¶ 20} The Buyer also alleges that if there is any error, it was due to the Sellers' neglect, not mistake of fact. The Buyer cites to R.C.5313.03, which requires the Sellers in a land contract to provide an annual statement showing the amounts credited to principal and interest and the balance due. The Buyer stated that if the Sellers complied with this statute, then any misunderstanding would have been cleared up prior to closing. The Buyer also complains that the Sellers failed to disclose a second mortgage.
 {¶ 21} The Buyer notes that the title agent's records show the amount the Buyer believed was due, but the records do not show any amount claimed by the Sellers. The Buyer also points out that the Sellers' letter alleging breach still did not disclose the amount they desired. The Buyer concludes that the Sellers cannot claim nonperformance if they prevented the Buyer from performing by failing to demand a certain amount.
 {¶ 22} The Sellers respond by stating that having funds available in escrow is not an offer to perform where the offer to perform is in an amount less than the balance due. The Sellers reiterate that the Buyer offered only $103,134.39, which is an amount less than their demand and also an amount less than the arbitrator (whose findings the Buyer adopts) found was due.
 {¶ 23} The Sellers then argue that the Buyer unilaterally breached the contract by failing to close, which allowed them to exercise their option of rescission. They also conclude that due to this unilateral breach, they are entitled to all payments made as liquidated damages for breach of the land contract. The Buyer then responds in its reply brief that the Sellers did not file an objection to the magistrate's decision and did not file a cross-appeal, and thus, they waived the argument of a unilateral breach.
 LAW ON RESCISSION {¶ 24} Rescission is an equitable remedy that invalidates an agreement. The court may order rescission for various reasons. For instance, the court can order rescission based upon misunderstanding. This usually involves a situation where both parties attach different meanings to the same manifestation. This could be due to a latent ambiguity or mutual misinterpretation. See Raffles v. Wichelhaus (1864), 159 Eng. Rep. 375 (the classic contract case known as "Peerless" where each contracting party was thinking about a different ship of that name). A failure of communication can result in rescission, especially where a phrase is reasonably subject to different interpretations. Mutual breach can give rise to a situation where rescission is appropriate. Further, mutual or bilateral mistake makes a contract voidable and rescission an option. There is also an abandonment theory, which utilizes the remedy of rescission.
 {¶ 25} The Ohio Supreme Court has expressly recognized the doctrine of mutual mistake as a ground for rescission where there is a mutual mistake as to a material part of the contract and where the complainant is not negligent in failing to discover the mistake. Irwin v. Wilson (1887),45 Ohio St. 426 (allowing the buyer in real estate purchase agreement to rescind). We have also explained that a mutual mistake of fact deals with a mistake that is material to the transaction and prevents a meeting of the minds and formation of a binding contract. Butler Wick Co. v.Stambaugh (Jan. 1, 1988), 7th Dist. No. 87CA55 (noting the possibility of rescission in such a case).
 {¶ 26} The Supreme Court more recently reiterated its Irwin holding and explained that a mistake is material to a contract when it concerns a basic assumption on which the contract was based and has a material effect on the agreed exchange of performances. Reilley v. Richards
(1994), 69 Ohio St.3d 352, 353. If the parties' intentions are frustrated by mutual mistake, rescission is possible. Id.
 {¶ 27} In Reilley, the Supreme Court reversed an appellate decision and held that where there was mutual mistake as to the fact that the realty was in a flood, plain rescission should be permitted. Id. at 353-354. The Court so held even though appellant was a lawyer who drafted the contract and had sufficient time to discover soil conditions. Id. at 354 (describing appellant as "unsophisticated" in such matters). The Court emphasized that if the judgment of the trial court on mutual mistake is supported by some competent, credible evidence, going to the essential elements of the case, the judgment should not be reversed by the appellate court unless it is against the manifest weight of the evidence. Id. at 353, citing C.E. Morris Co. v. Foley Constr. (1978),54 Ohio St.2d 279.
 {¶ 28} The Supreme Court has also explained that a contract may be rescinded based upon an abandonment theory, which entails breach and acceptance of or acquiescence to that breach, giving rise to an inference of mutual consent from the surrounding facts and circumstances. Hodgesv. Ettinger (1934), 127 Ohio St. 460, 463 (defining abandonment as intentional relinquishment of a known right). Abandonment is a matter of intention and a question of fact. Foremost Seafood v. Stiver (Dec.8, 1999), 1st Dist. No. C-99-0247. In such a case, the parties are restored to their original positions and neither may sue for breach to compel specific performance. See, e.g., Hodges, 127 Ohio St. 460; Hunter v. BPSGuard Serv., Inc. (1995), 100 Ohio App.3d 532, 541 (10th Dist.);Bryant v. Richfield Prop. (Sept. 5, 1990), 9th Dist. No. 14533. {¶ 29}
Additionally, courts have held that the mutual failure to perform can give rise to a presumption of mutual assent to rescission. G/GM RealEstate Corp v. Susse Chalet Motor Lodge of Ohio, Inc. (June 4, 1999), 3d Dist. No. 9-88-39; Reed v. BDS Holdings (June 4, 1993), 3d Dist. No.14-92-41; Dickson v. Wolin (1934), 18 Ohio Law Abs. 107.
 {¶ 30} When rescission is imposed for such reason, the parties should be restored to status quo as much as possible. A purchaser generally should recover the money paid on the purchase price. G/GM Real Estate, 3d Dist. No. 9-88-39; Reed, 3d Dist. No. 14-92-41. Specifically, the vendee on a real estate contract should receive his down payment back upon rescission for mutual failure to perform. Reed, supra.
 ANALYSIS {¶ 31} First, we must point out that at trial, the Buyer's attorney placed the theory of mutual mistake or mutual breach and rescission on the record. (Tr. 117-118).Even more importantly, counsel then stated, "the actual issue is whether she conveyed that understanding to the purchasers, and that's really where we are at." (Tr. 119).
 {¶ 32} Here, the magistrate could reasonably believe Mrs. Manser's testimony that she conveyed her opinion that the payoff was $109,000 to the Buyer's escrow agent or someone at that title company (and to an employee of the Buyer thereafter). There is nothing incredible about her testimony; in fact, it is harder to believe that Mrs. Manser did not voice her opinion on the payoff when presented with an offer to pay only $103,134.39.
 {¶ 33} The magistrate was in the best position to weigh the evidence and judge the credibility of the witnesses after viewing their voice inflections, demeanor, and gestures. See Seasons Coal Co., Inc. v. Cityof Cleveland (1984), 10 Ohio St.3d 77, 80. There is substantial competent and credible evidence to support a finding that the Sellers conveyed their payoff figure to the Buyer. See Reilley, 64 Ohio St.3d at 353, citing C.E. Morris Co., 54 Ohio St.2d 279.
 {¶ 34} There is also clear and convincing evidence of a mutual failure to perform. At closing or maybe even a few days after the scheduled closing, the Buyer offered only $103,134.39 as their payoff. As aforementioned, we accept that the Sellers refused this offer and demanded $109,000 under their reading of the contract, which stated that the principal balance due was $109,000. Because the parties agreed to the arbitrator's findings, we start with the fact that the Buyer had to pay off a balance of $106,454.66 in order to close on the property. Although the Sellers' payoff figure may have been incorrect, so was the payoff figure offered by the Buyer.
 {¶ 35} Both parties were mistaken as to the final payoff required by the terms of the agreement, which is entailed in a land contract, a purchase agreement, and an addendum. Both parties attached different and incorrect meanings to the terms of the agreement. The purchase price and terms of payments are certainly considered material terms of the agreement.
 {¶ 36} As the Buyer points out, R.C. 5313.03 states that the vendor in a land contract shall supply the vendee with a statement on the amount credited to principal and interest and the balance due "at least once a year, or on demand of the vendee, but no more than twice a year." But, R.C. 5313.04 provides that on the vendor's failure to comply, the vendee can enforce a violation of R.C. 5313.03 in a municipal, county, or common pleas court. Thus, if this corporate buyer desired an annual statement from these individual homeowners, they could have demanded a statement, and if their demand went unheeded, they could have enforced the violation under R.C. 5313.04 at a time before the closing passed. The statute provided their remedy.
 {¶ 37} Contrary to the Buyer's argument here, the mere fact that the Supreme Court's case dealt with a buyer asking for rescission does not mean that rescission is impermissible unless it is the buyer who seeks such remedy. In fact, Reilley used words such as "complaining party," instead of limiting itself to "buyer." Reilley, 69 Ohio St.3d at 352-353.
 {¶ 38} As in Reilley, we have an unsophisticated party seeking an equitable remedy and alleging affirmative defenses of consent and waiver. The Sellers were individual homeowners who were seeking to sell their realty but who had some trouble understanding the combination of documents drafted by the Buyer, a corporation specifically in the business of buying and selling realty. The Sellers sought an equitable remedy of quiet title to their property or any other equitable relief the court found just. The court, rather than find unilateral breach by either party, found bilateral breach and/or mutual mistake and imposed the equitable remedy of rescission.
 {¶ 39} In conclusion, the magistrate and the trial court were not required to determine that the Buyer rebutted a presumption of acquiescence merely because they still want the property. Also, acquiescence was not the only theory allowing imposition of the rescission remedy.
 {¶ 40} Contrary to the Buyer's contention, the Sellers did not unilaterally prevent the Buyer from performing in a manner that would disallow rescission when the Sellers demanded an incorrect figure. This is because the Buyer also insisted on an incorrect figure. As aforementioned, both parties let the closing date pass without either party succumbing to the other's demands, and the arbitrator, whose decision no one contested, found that both parties were mistaken and thus both in breach. Although the Buyer tried to prove that the Sellers never voiced their demand, the magistrate was not required to make this presumption and was permitted to find the Sellers credible.
 {¶ 41} As a result of the unusual facts and circumstances existing in this case, including the fact that the arbitrator's decision was not objected to and was binding on various preliminary issues, the magistrate's and then the trial court's decision to order rescission is upheld, and these two assignments of error are overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 42} The Buyer's third and final assignment of error provides:
 {¶ 43} "Assuming arguendo the magistrate and the trial court did not err in finding that rescission was proper, then the magistrate and the trial court erred in failing to award appellant all funds paid under the contract."
 {¶ 44} As aforementioned, rescission of a contract should restore the status quo. Thus, a buyer can generally recover payments made on a contract, including down payments for realty. Reed, 3d Dist. No. 14-92-41; G/GM Real Estate, 3d Dist. No. 9-88-39. Obviously, in a case such as this, the Buyer cannot be permitted to live in or rent out property of the Sellers for over a year and half for free. Thus, the Sellers are entitled to some amount for the Buyer's use of their property.
 {¶ 45} Here, the magistrate credited the Buyer with $22,540. The Buyer does not dispute that this encompasses all payments made, except for the $2,000 the Buyer paid for an extension in March 1998. The magistrate found the value of the Buyer's use of the Sellers' property to be $1,114.83 per month, totaling $23,411.43. This monthly amount was the amount paid by the Kirkpatricks under their land contract with the Buyer. The magistrate concluded that the Buyer owed the Sellers $871.43, the difference between what the Buyer paid the Sellers (minus the $2,000 extension) and the computed fair market value.
 {¶ 46} The Buyer first takes issue with the fact that the magistrate refused to restore $2,000 paid for an extension. The magistrate determined that since the arbitrator found that the $2,000 was consideration for an extension of time, rather than part of the purchase price, this amount should not be restored to the Buyer. The Buyer responds that if rescission is the voiding and nulling of a contract, then a buyer has the right to recover whatever payments it made on the contract regardless of how they are characterized.
 {¶ 47} As the magistrate stated, the arbitrator found that the language of the addendum to the contract was ambiguous and should be construed against the Buyer as the drafter. Thus, the arbitrator refused to apply the $2,000 payment in March 1998 as a reduction to the principal due on the land contract. Instead, the arbitrator found that the $2,000 was merely consideration for an extension of the original closing date from September 1, 1997 to May 1, 1998.
 {¶ 48} Although the purchase agreement was rescinded, this does not mean that the Buyer is entitled to the money paid for the extension of the closing date. We emphasize here that the Sellers were not able to utilize their own property. Rather, the Buyer had use and control over the property during the period of the contract. By agreeing to the extension, the Sellers gave the Buyer not only an extended right to exercise the option to purchase their property but also the continued right to remain on their property. Thus, there was more consideration exchanged for the $2,000 than a mere extended option to purchase. Under the particular facts and circumstances existing herein, the magistrate and trial court could properly find that the Sellers were not required to refund the $2,000 payment made by the Buyer under the terms of the extension in this case.
 {¶ 49} The next argument raised by the Buyer under this assignment of error is that the Sellers are not entitled to "fair rental value" as stated by the magistrate but are only entitled to "a reasonable sum for use and occupancy." Contrary to the Buyer's contention, there does not appear to be any need for us to distinguish between fair rental value and reasonable sum for use and occupancy. The case they cite that uses the language "reasonable sum for use and occupancy" does not pit such term against "fair rental value." Adam v. Southwood (1958), 107 Ohio App. 425,429-430 (8th Dist.). In fact, that case actually works against the Buyer as it discussed use, rents and profits as being recoverable. Id., citing Higby v. Whittaker (1837) 8 Ohio St. 198, 201-202.
 {¶ 50} Nevertheless, the magistrate here stated that the Buyer had possession and that the Sellers were entitled to "a reasonable value for the use of the real estate * * *." Two more times the magistrate stated that the Sellers were entitled to payment for "the use" of their property. Contrary to the Buyer's suggestion, it does not appear the magistrate mentioned "fair rental value." Thus, the magistrate in fact used the terminology and test urged by the Buyer.
 {¶ 51} The Buyer alternatively argues that there is no evidence that $1,114.83 per month represents a fair rental value merely because that is what the Kirkpatricks were paying under a land contract with the Buyer. The Buyer notes that it was only paying $977 per month to the Sellers herein. The Buyer also notes that payments under a land contract are often higher than the fair rental value since a land contract usually leads to ownership and includes items such as taxes and insurance which tenants do not pay for mere possession.
 {¶ 52} As aforementioned, the magistrate used the term "reasonable use" as requested by the Buyer itself, rather than the term "fair rental value." We also note that it seems contradictory to argue that the Sellers would only be entitled to a reasonable sum for the use and occupancy of its land and then insist that the sum the Buyer itself was being paid each month for the use and occupancy of the land was not reasonable. Contrary to the Buyer's urging, we do not agree that land contract payments are always higher than rental payments; in fact, land contracts often require down payments in addition to the monthly payment. For instance, here, the Buyer paid the Sellers $3,000 in down payments in addition to the monthly payments. Moreover, the contract with the Kirkpatricks provided that they were to pay a $3,500 deposit in addition to the monthly payments. Thus, the Buyer's rationale is not persuasive. Additionally, the Kirkpatricks stayed in the house after the land contract fell through; thus, paying this rent to the Sellers.
 {¶ 53} Moreover, although not applicable herein, R.C. 5313.10 implies that the payments made under a land contract are typically enough to cover the fair rental value. Finally, as aforementioned, under the case cited by the Buyer which in turns cites a Supreme Court case, profits are another possibility in a rescission case. As such, the trial court could reasonably find that the amount paid by the Kirkpatricks to the Buyer constituted a reasonable value for the Buyer's use of the Sellers' property.
 {¶ 54} Lastly, the Buyer argues it is entitled to interest on the amounts paid at the time of each payment since the Sellers were able to use its money. Although the Sellers had the use of the Buyer's money, the Buyer had the use of the Seller's realty and the use of the Kirkpatricks' money. Hence, this argument is without merit and this assignment of error is overruled.
 {¶ 55} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.